**In The**
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-20-00246-CV**

**IN THE INTEREST OF E.M.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 19-09-13141-CV**

**MEMORANDUM OPINION**

J.R.M. ("Father") and F.M. ("Mother"),[1] the parents of the minor child E.M.,

appeal the trial court's order terminating their parental rights. In five issues, Mother

challenges the legal and factual sufficiency of the evidence supporting the trial

court's findings under sections 161.001(b)(1)(E) and 161.001(b)(1)(O) of the Texas

Family Code, as well as the legal and factual sufficiency of the evidence supporting

the trial court's finding that termination of her parental rights is in E.M.'s best

interest, and she argues that the trial court erred by appointing the Department of

Family and Protective Services ("the Department") permanent managing

---

[1]We will refer to J.R.M. and F.M. collectively as "appellants."

conservator of E.M. and failing to appoint Intervenor, E.M.'s great uncle ("Uncle"), as managing conservator. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (O), (2). In his sole issue, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of his parental rights is in E.M.'s best interest. We affirm the trial court's order terminating appellants' parental rights.

## THE EVIDENCE

CPS investigator Mary Ann Marinelli testified that the case was assigned to her in September 2019 after allegations of sexual abuse and neglectful supervision of E.M., as well as reports that Mother had major depressive disorder and was suicidal, and that Father was a registered sex offender. Marinelli spoke with Mother, and she explained that Mother indicated she was worried about E.M. being alone with Father because of his status as a sex offender. Mother informed Marinelli that she had suffered from mental health issues since the age of thirteen. Mother also told Marinelli that the police had been to her home many times because of domestic violence between her and Father, and that she would need assistance to care for E.M.

According to Marinelli, Father is Mother's great-uncle. Marinelli explained that she spoke to Father, and Father also admitted that there had been ongoing domestic violence between him and Mother. Marinelli testified that when she visited the parents' residence, the home smelled of dog urine, and there was "some trash around the home." According to Marinelli, the parents' home was "unsanitary[,]

2

which would cause a concern for safety." Marinelli testified that she was concerned about Father's ability to care for E.M. because he did not speak clearly and seemed to be hearing impaired. Marinelli explained that she ruled out sexual abuse and confirmed that Father is not a registered sex offender and does not have criminal convictions. Marinelli testified that when she met E.M., E.M. appeared to be healthy, clean, and well dressed.

Brandi Mathews testified that she was the Montgomery County conservatorship worker assigned to E.M.'s case until August 2020, when she left county employment and a new caseworker was assigned. Mathews explained that the trial court required both parents to participate in services under a family service plan developed by the Department. According to Mathews, the service plan required Mother to undergo a psychological evaluation, participate in individual counseling, complete a psychiatric evaluation, maintain visits with the child, maintain a safe and stable home, and participate in family counseling. Mathews explained that Mother did not complete any of the court-ordered services while Mathews was assigned to the case. Mathews testified that during visits with Mother, E.M. cried uncontrollably, and during one visit, Mother "just sat [E.M.] down in the middle of the floor and told [Mathews] that she had to leave." Mathews testified that neither parent was able to console E.M., give her a bottle, or change her diapers during visits. According to Mathews, Mother was hospitalized due to mental health issues "often throughout the

3

span of the case[,]" and she was also incarcerated due to family violence against her boyfriend. Mathews explained that Mother and Father frequently broke up and reunited during the pendency of the case.

Mathews testified that the family service plan required Father to maintain a safe and stable home environment, participate in individual and family counseling, complete a psychological evaluation, and provide proof of income. According to Mathews, Father did not complete any of the required services. Mathews explained that when Father visited with E.M., E.M. would cry anytime he held her, and Father also "had difficulties with holding her, changing diapers, making bottles, [and] consoling her." Mathews explained that she became aware of Uncle (Father's brother) as a prospective placement for E.M. in November 2019, and she testified that Father and Mother did not want Uncle considered for placement because Uncle was abusive.

Mathews testified that when she contacted Uncle, who resides in Michigan, he wanted to be considered for placement. Mathews explained that Uncle submitted the requested documentation, but he was not approved for placement, and E.M. was placed in foster care. Mathews testified that she wanted additional information about the medication Uncle was taking, as well as a stalking charge and another pending felony charge. In addition, Mathews testified that she "did not receive any FBI fingerprint checks for [Uncle] or the additional individuals living in the home[,]"

4

and she wanted "additional information about his willingness to care for a child with special needs and if [he] would be able to maintain her therapies and the things with her cranial band."

According to Mathews, E.M. has special needs and requires occupational therapy and speech therapy, and she wears a cranial band to correct an issue with "one side of her head being flatter . . . due to her always being laid on that side." Mathews testified that at ten months of age, E.M. was not rolling over, was not interested in crawling, and was not "making the sounds and things that a typical baby her age would do." Mathews explained that while handling the case, she determined that Mother was "slow to comprehend, and . . . there were some psychiatric concerns[.]" During cross-examination by Father's counsel, Mathews testified that Father later told her that he wanted E.M. placed with Uncle, and she explained that Uncle does not have any criminal history involving violence or children.

Mercedes Beyan, a caseworker for the Department, testified that she received the case when Mathews left the agency. Beyan explained that she referred Mother for individual counseling, psychiatric assessment, psychological evaluation, and a "BIPP assessment[,]" but Mother did not complete any of the services. According to Beyan, Father also did not complete any services, and he has not regularly visited with E.M. Beyan explained that she is concerned that Mother could not provide care for E.M. because Mother failed to complete services and failed to show that she has

5

a stable home environment. Beyan also testified that Mother "has stated that she can't take care of [E.M. by herself[.]" Beyan explained that she has not had personal contact with Father, and her only concern about his ability to care for E.M. is his failure to complete the required services. According to Beyan, the Department recommends termination of both parents' rights and adoption by E.M.'s foster parents. With respect to Uncle, Beyan testified that she is concerned about a pending criminal charge, Uncle's medication, "and the fact that we haven't gotten direct answers on [whether] they can provide for ongoing medical care for the child and her special needs, and [Mother] has told me that she does not want her child to go there."

CASA volunteer Kayla Barrientes, the guardian *ad litem*, testified that she has spoken with E.M.'s foster parents and has been to their home. Barrientes explained that she has seen E.M.'s foster parents read to E.M., play with her, work with her on pulling herself up, and "been loving on [E.M.] and caring for her." According to Barrientes, when E.M. is with her foster parents, she is happy, smiling, and in a great mood, and E.M. is "doing wonderful[ly]." Barrientes testified that Uncle contacted her to express concern about E.M., and Uncle told her that the relationship between Mother and Father was not healthy. Uncle eventually informed Barrientes that he wanted E.M. placed with him, and Uncle's wife called Barrientes to ask about visitation and whether E.M. could be placed with them.

According to Barrientes, during visits with Mother and Father, E.M. was distressed and cried off and on throughout the visits, and the caseworker had to help Father and Mother soothe and care for E.M. Barrientes testified that she is concerned about the stability of the relationship between Mother and Father, as well as their ability to meet E.M.'s basic needs and provide a stable home for her, and she opined that the parents' rights should be terminated. Barrientes testified that Mother has not been able to demonstrate that she can maintain a stable home, did not complete any required services, and has engaged in criminal activity "throughout the case." According to Barrientes, Mother was hospitalized off and on while the case was pending. Barrientes also testified that Father failed to maintain contact with the Department, did not complete any of the required services, and has not demonstrated an ability to provide a stable home for E.M. Barrientes explained that CASA agrees with the Department's recommendation that adoption by her non-relative foster parents is in E.M.'s best interest.

According to Barrientes, her concerns about Uncle were not addressed, and she did not recommend that E.M. be placed with Uncle. Barrientes testified that Uncle had a criminal charge involving harassment. Barrientes explained that Uncle is a long-haul truck driver who is only home for one day per week, so Uncle's wife would be E.M.'s primary caregiver. Barrientes testified that Uncle told her that since he found God and became a preacher, he was no longer abusive toward others.

Barrientes opined that Uncle and his wife could care for E.M.'s needs with respect to the cranial band. Barrientes testified that the Department had asked for Uncle's diagnosis and a reason why Uncle was taking a particular medication, and the Department was not provided with a diagnosis. According to Barrientes, Uncle eventually disclosed that he suffers from bipolar disorder. Additionally, Barrientes testified that Uncle never provided documentation that he had completed foster parent classes.

Barrientes explained that she is concerned about Uncle's harassment charges "and the allegations of sexual abuse as well as the felony that was on his record." Barrientes further testified that she was also concerned about Uncle's ability to provide a stable home due to E.M.'s special needs and medical needs, as well as Uncle's inability to be home frequently with E.M. due to his job as a trucker. Barrientes explained that E.M. has delays in her speech and fine motor skills, so she requires speech therapy and occupational therapy, and there is also "concern about her muscle tone in her legs." According to Barrientes, E.M.'s foster parents are meeting her needs, and there are no concerns regarding their care of E.M.

Mother testified that she is twenty-three years old, and she has been married to Father, who is her great-uncle, since 2017. According to Mother, she has been living with her fiancé, who she met in a psychiatric facility, for almost a year. Mother explained that she and Father are currently separated and plan to divorce. Mother

8

also testified that her relationship with Father was "[n]ot good[,]" and that she had been charged with assault two or three times. Mother explained that after E.M.'s birth, she was readmitted to the psychiatric hospital, and she testified that she had been in a psychiatric hospital approximately twenty times during a period of fourteen or fifteen months. Mother testified that she suffers from bipolar disorder and schizoaffective disorder, as well as suicidal ideation and depression, and she began having mental health problems when she was thirteen years old. Mother testified that she believes her mental health issues affect her ability to provide care for E.M.

Mother testified that she does not work, and she receives supplemental security income (SSI) due to bipolar disorder and a learning disability. Mother opined that Father cannot provide safe care for E.M., and she explained that Father does not work, but he "has SSI and union money." Mother testified that she wanted E.M. placed with Uncle, and she explained that her previous allegations that he was abusive toward women are untrue. Mother explained that she believed placing E.M. with Uncle is in E.M.'s best interest.

Father testified that he is sixty-seven years old and has four other children. According to Father, he and Mother began dating when he was in his sixties and Mother was approximately twenty years old. Father explained that he is not employed, but he receives a pension and social security. Father testified that he initially did not want E.M. to be placed with Uncle because Uncle and his wife fight,

9

but he now believes that E.M. would be "in good hands[]" with Uncle. Father explained that he believes he can care for E.M., but he thinks E.M. would be better off with Uncle because Uncle is a preacher. According to Father, Mother cannot care for E.M. because Mother is frequently hospitalized. Father testified that he did not attend the classes required by the family service plan. Additionally, Father testified that Mother assaulted him on three occasions.

Uncle testified that he has four children, one of whom is Mother's father. Uncle testified that he resides in Michigan. Uncle explained that when he learned of the relationship between Mother and Father, he contacted the district attorney and learned that there is "no law against a great-uncle marrying a great-niece." Uncle opined that Mother's mental health issues make her incapable of caring for E.M., and he testified that Father is in bad health and that Father struggles to console E.M.

According to Uncle, his job requires him to be away from home six days per week. Uncle testified that he has no concern about his wife's ability to safely care for E.M., and he explained that if he were awarded conservatorship of E.M., his wife would be E.M.'s mother and would "take very good care of her and love her[.]" Uncle testified that there was no domestic violence in any of his marriages, and he denied telling Barrientes that he no longer abused women because he found God. Uncle testified that he slapped his first wife because she was not properly caring for their child. Uncle explained that he was charged with a felony for leaving the scene

10

of an accident, but the charge was dropped. According to Uncle, his harassment charge was for calling one of his former wives excessively while he was trying to save their marriage. The Department rested at the conclusion of Uncle's testimony.

Mother's counsel called ICPC specialist IV Carolyn Rene Blake to testify. Blake testified that she received an ICPC packet for E.M. and submitted the packet to Michigan. Blake explained that Uncle was the subject of the home study, and she testified that Uncle received tentative approval, and the condition for approval was that Uncle needed to become licensed as a foster parent. Blake testified that her team sent an addendum to Michigan regarding concerns about "medications that the caregiver was not forthcoming about." According to Blake, there was also concern about Uncle's stalking charge and his willingness and ability to care for a child with developmental needs. Blake explained that as of August 4, 2020, Michigan had not rescinded its approval of the placement. Blake testified that approval of a home study does not mean a child will be placed in that home. Counsel for both Mother and Father, as well as the guardian *ad litem*, rested at the conclusion of Blake's testimony.

Uncle's wife, K.M., testified that she and Uncle have been married for fourteen years. According to K.M., Uncle is a good provider, and is "caring and attentive to the needs of the family." K.M. testified that she loves E.M. K.M. explained that she does not work outside the home, and she is currently a caregiver

11

for her two grandchildren. K.M. testified that both she and Uncle completed a home study in Michigan.

According to K.M., she asked Mathews about having visits with E.M., and Mathews never gave a definite response and did not tell K.M. that she could visit as long as E.M.'s parents agreed. K.M. testified that Mathews often did not return her phone calls or respond to text messages. K.M. testified that Mathews never requested documentation regarding Uncle's felony charge or any other concerns. According to K.M., Uncle suffers from anxiety, but does not have any other mental health diagnoses. K.M. testified that she has never seen Uncle be violent with anyone.

According to K.M., if Uncle were awarded conservatorship of E.M., she and her husband planned to bring E.M. to Michigan and adopt her. K.M. testified that Mother and Father were unable to appropriately console E.M. when she cried, and she opined that it would emotionally impair E.M. if her parents cannot console her. K.M. explained that she purchased a crib, bed, and some toys in anticipation of E.M. coming to her home, and she testified that E.M. would have her own room.

K.M.'s daughter, M.R., testified that she has a six-year-old and a one-year-old, and K.M. cares for the children in her home while M.R. is at work. M.R. testified that she would be able to support K.M. in caring for E.M. and could watch E.M. for K.M. and Uncle.

## MOTHER'S FIRST ISSUE

In issue one, Mother challenges the legal and factual sufficiency of the evidence supporting terminating her parental rights under section 161.001(b)(1)(E) of the Texas Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Mother asserts that, given her mental health diagnoses, there is no evidence that she engaged in a voluntary, deliberate, and conscious course of endangering conduct.

When reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the finding to determine whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, the evidence is legally insufficient. *Id.*

When reviewing the factual sufficiency of the evidence, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* We give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We consider whether disputed evidence is such that a reasonable

13

factfinder could not have resolved that disputed evidence in favor of its ruling. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

The decision to terminate parental rights must be supported by clear and convincing evidence, *i.e.*, "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In the Interest of J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *see also In the Interest of J.L.*, 163 S.W.3d at 84. We will affirm a judgment if any one of the grounds is supported by legally and factually sufficient evidence and the best-interest finding is also supported by legally and factually sufficient evidence. *In the Interest of C.A.C., Jr.*, No. 09-10-00477-CV, 2011 WL 1744139, at *1 (Tex. App.—Beaumont May 5, 2011, no pet.) (mem. op.). However, when, as here, a parent challenges a trial court's findings under section 161.001(b)(1)(E), we must review the sufficiency of that ground as a matter of due process and due course of law. *In the Interest of N.G.*, 577 S.W.3d 230, 235 (Tex. 2019).

Section 161.001(b)(1)(E) of the Family Code allows for termination of a parent's rights if the trier of fact finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(E). Under subsection (E), endangerment means to expose the child to loss or injury or to jeopardize a child's emotional or physical health. *In the Interest of M.L.L.*, 573 S.W.3d 353, 363 (Tex. App.—El Paso 2019, no pet.); *In the Interest of M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Termination of parental rights under subsection (E) must be based on more than a single act or omission and requires a voluntary, deliberate, and conscious course of conduct by the parent. *In the Interest of M.L.L.*, 573 S.W.3d at 363-64. "Scienter is not required for an appellant's own acts under [s]ection 161.001(b)(1)(E), although it is required when a parent places her child with others who engage in endangering acts." *In the Interest of I.D.G.*, 579 S.W.3d 842, 851 (Tex. App.—El Paso 2019, pet. denied) (op. on reh'g). The endangering conduct need not occur in the child's presence, and it may occur both before and after the Department removed the child. *Id.* at 851.

A parent's conduct that subjects a child's life to instability and uncertainty endangers the child's emotional or physical well-being. *In the Interest of M.L.L.*, 573 S.W.3d at 363. As used in subsection (E), the term "conduct" includes both the

15

parent's actions and failures to act. *In the Interest of M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied). Endangerment is not limited to actions directed toward the child, and it includes the parent's actions before the child's birth. *In the Interest of J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Mental illness is not a ground for terminating the parent-child relationship, but untreated mental illness can expose a child to endangerment and is a factor the trial court may consider. *In the Interest of S.R.,* 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). In determining whether a parent endangered the child's physical and emotional well-being, the factfinder may consider evidence of a parent's failure to comply with services to improve her mental health. *Id.* at 365.

The trial judge heard evidence that Mother suffers from suicidal ideation and has longstanding mental health issues. Mother testified that she believes her mental health issues affect her ability to care for E.M., and that she believes placement with Uncle is in E.M.'s best interest. In addition, the trial judge heard evidence that the parents' residence was unsanitary, smelled of dog urine, and contained trash. Moreover, the trial judge heard evidence that Mother failed to complete services designed to improve her mental health, such as a psychological evaluation, psychiatric evaluation, and individual counseling. The trial judge also heard evidence that during visits with E.M., Mother was unable to console E.M. The trial judge also heard evidence that Mother and Father were involved in domestic

16

violence against each other, and Mother had been incarcerated for assaulting her boyfriend. Furthermore, the trial judge heard Barrientes testify that Mother failed to show that she has a stable home environment, and that Mother stated she is unable to care for E.M. alone. In addition, the trial judge heard evidence that when E.M. came into the Department's care, she required a cranial band because one side of her head was flatter than the other because she was always laid on the same side.

Viewing all the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that Mother knowingly engaged in conduct which endangers the physical or emotional well-being of the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *In the Interest of J.O.A.*, 283 S.W.3d at 345; *In the Interest of J.F.C.*, 96 S.W.3d at 266; *In the Interest of I.D.G.*, 579 S.W.3d at 851; *In the Interest of M.L.L.*, 573 S.W.3d at 363; *In the Interest of S.R.,* 452 S.W.3d at 363, 365;; *In the Interest of M.R.J.M.*, 280 S.W.3d at 502. We therefore conclude that the evidence was legally sufficient. *See In the Interest of J.F.C.*, 96 S.W.3d at 266. In addition, we conclude that the factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *See id.* Considering the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction. *See id.* Accordingly, we conclude that the evidence was factually

17

sufficient to support the trial court's finding that Mother knowingly engaged in conduct that endangered E.M.'s physical or emotional well-being. We overrule issue one. Having concluded that the evidence was legally and factually sufficient to support the trial court's finding as to subsection 161.001(b)(1)(E), we need not reach issue two, in which Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings under section 161.001(b)(1)(O). *See In the Interest of N.G.*, 577 S.W.3d at 235; *In the Interest of C.A.C., Jr.*, 2011 WL 1744139, at \*1; *see also* Tex. R. App. P. 47.1.

MOTHER'S ISSUE THREE AND FATHER'S ISSUE ONE – BEST INTEREST

In her third issue, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights is in E.M.'s best interest. In his sole issue, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of his parental rights is in E.M.'s best interest. We address Mother's issue three and Father's issue one together.

Regarding the child's best interest, we consider a non-exhaustive list of factors: (1) the desires of the child; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the best interest of the child; (6) plans

18

for the child by these individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see* Tex. Fam. Code Ann. § 263.307(b). No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in the child's best interest. *See In the Interest of A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). The best-interest determination may rely on direct or circumstantial evidence, subjective facts, and the totality of the evidence. *See In the Interest of N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). Evidence that supports terminating parental rights due to endangerment of the child also supports a finding that termination is in the child's best interest. *In the Interest of C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The impact of a parent's mental illness on her ability to parent and the stability of the home are relevant facts in the best-interest analysis. *In the Interest of R.J.*, 579 S.W.3d 97, 118 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

With respect to the child's best interest, the trial judge heard evidence that Mother and Father were involved in ongoing domestic violence against each other, and their home was unsanitary. The trial judge also heard evidence that neither Mother nor Father could console E.M. In addition, the trial judge heard evidence

that Mother had stated that she is unable to care for E.M. by herself, and Mother and Father both failed to demonstrate the ability to provide a stable home. Moreover, the trial judge heard evidence that E.M.'s foster parents are meeting her needs, E.M. is doing wonderfully in her placement with them, and that CASA believed adoption by her foster parents is in E.M.'s best interest. Furthermore, the trial judge heard evidence that Mother had been charged with assault two or three times. Additionally, the trial judge heard Mother testify that she does not believe Father can provide a safe home for E.M., and that her own mental health issues affect her ability to care for E.M. The trial judge also heard Father testify that he believes placing E.M. with Uncle is in her best interest. The trial judge further heard Uncle testify that Mother's mental health issues make her incapable of caring for E.M., and that Father is in poor health and struggles to console E.M.

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See* Tex. Fam. Code Ann. § 263.307(a). As the sole judge of the credibility of the witnesses and the weight to be given to their testimony, the trial court could reasonably conclude that termination of the parental rights of Mother and Father was in E.M.'s best interest. *See* Tex. Fam. Code Ann. §§161.001(b)(2), 263.307; *see also In the Interest of J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72; *In the Interest of R.J.*, 579 S.W.3d at 118. Viewing all the evidence in the light most favorable to the trial court's finding, we conclude

20

that a reasonable trier of fact could have formed a firm belief or conviction that terminating the parental rights of Mother and Father is in E.M.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *In the Interest of J.F.C.*, 96 S.W.3d at 266. We further conclude that the factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations, and considering the entire record, the evidence that a reasonable factfinder could not have credited in favor of the finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction. *See id.* Therefore, the evidence was legally and factually sufficient.

We conclude that the Department established, by clear and convincing evidence, that termination of the parental rights of Mother and Father is in E.M.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *In the Interest of C.A.C., Jr.*, 2011 WL 1744139, at *1. Accordingly, we overrule Mother's third issue and Father's sole issue.

MOTHER'S FOURTH ISSUE

In her fourth issue, Mother argues that the trial court erred by appointing the Department as E.M.'s permanent managing conservator. Mother argues that the trial court did not make a finding that appointing a parent as E.M.'s managing conservator would significantly impair E.M.'s physical health or emotional development. *See* Tex. Fam. Code Ann. § 153.131.

21

We review a trial court's conservatorship determination for an abuse of discretion, and we will reverse only if the trial court's decision is arbitrary or unreasonable. *In the Interest of J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). "Section 153.131 applies when the parents' parental rights have not been terminated. However, when the parents' parental rights have been terminated, section 161.207 governs the appointment of a managing conservator." *In the Interest of A.B.*, No. 05-18-00649-CV, 2018 WL 4784578, at *5 (Tex. App.—Dallas Oct. 4, 2018, pet. denied) (mem. op.). Section 161.207 provides that the trial court must appoint "a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207; *see In the Interest of A.B.*, 2018 WL 4784578, at *5.

Having concluded that the evidence was legally and factually sufficient to support the trial court's findings that Mother committed the predicate act described in section 161.001(b)(1)(E) and that termination of Mother's parental rights is in E.M.'s best interest, we cannot conclude that the trial court abused its discretion by appointing the Department as managing conservator of E.M. *See In the Interest of A.B.*, 2018 WL 4784578, at *5; *see also* Tex. Fam. Code Ann. § 161.207. Accordingly, we overrule Mother's fourth issue.

## MOTHER'S FIFTH ISSUE

In issue five, Mother argues that the trial court erred by appointing the Department as E.M.'s permanent managing conservator instead of Uncle. Mother contends that Uncle "had intervened and was rightly before the Court to be considered for the appointment as the managing conservator[,]" and she argues that the evidence was insufficient to support the conclusion that appointing the Department as managing conservator is in E.M.'s best interest.

"On appeal, a party may not complain of errors that do not injuriously affect her or that merely affect the rights of others." *In the Interest of D.C.*, 128 S.W.3d 707, 713 (Tex. App.—Fort Worth 2004, no pet.). Uncle is not a party to this appeal. Mother has not explained how the trial court's decision to appoint the Department managing conservator instead of Uncle injured or affected her own rights; therefore, she lacks standing to complain of errors affecting Uncle's rights. *See id.*

The trial court heard evidence that Uncle's job as a trucker required him to be away from home six days per week, and that if E.M. were in his care, he intended for his wife to care for E.M. while he was working. In addition, the trial judge heard evidence that Uncle had not become licensed as a foster parent. Furthermore, the trial judge heard evidence that Father and Mother did not want Uncle considered for placement because he was abusive. Even if Mother had standing, she has not demonstrated that the trial court's decision was arbitrary or unreasonable. *See In the*

*Interest of J.A.J.*, 243 S.W.3d at 616. Accordingly, we overrule Mother's fifth issue.

Having overruled Father's sole issue and each of Mother's issues, we affirm the trial court's judgment terminating appellants' parental rights.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on March 3, 2021
Opinion Delivered April 15, 2021

Before Golemon, C.J., Kreger and Horton, JJ.